### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

       Plaintiff,

vs.

KAREN ANTOINETTE JOHNSON (14),

       Defendant.

Case No. 13-40060-14-DDC

### MEMORANDUM AND ORDER

A jury convicted defendant Karen Antoinette Johnson of conspiring to distribute 280 grams or more of crack cocaine. This matter is before the court on Ms. Johnson's Motion for Judgment of Acquittal (Doc. 1113) and Motion for New Trial (Doc. 1114). The government has responded to each (Docs. 1121, 1122). For reasons explained below, the court denies both motions. In short, the government presented evidence sufficient for a rational juror to find Ms. Johnson guilty beyond a reasonable doubt, and Ms. Johnson has failed to show that the ends of justice require a new trial.

#### I.     Background

This case involved a conspiracy to distribute crack cocaine in Junction City, Kansas. The investigation revealed that Albert Banks, Anthony Thompson, and Martye Madkins distributed crack cocaine to numerous people, including Ms. Johnson. These individuals, in turn, would use, sell, or both use and sell the crack cocaine they acquired from Mr. Banks, Mr. Thompson, or Mr. Madkins. Johnny Ivory and Steven Clark supplied Mr. Banks, Mr. Thompson, and Mr. Madkins. In Count One of the Second Superseding Indictment, the Grand Jury charged that sometime

1

before June 1, 2012, through on or about May 16, 2013, 14 defendants, including Ms. Johnson, entered into an agreement to distribute at least 280 grams of crack cocaine. *See* Doc. 195 at 2.

### A. Controlled Buys

At trial, the government first introduced evidence about this conspiracy through Glen Virden, Kansas Bureau of Investigation ("KBI") Special Agent. Agent Virden explained that, in April 2012, the Junction City Police Department had contacted the Kansas Bureau of Investigation (the "KBI") about a crack distribution ring in the Junction City and Manhattan, Kansas areas. The KBI agreed to help with the investigation. The KBI enlisted the assistance of a cooperating individual, or confidential informant, to set up controlled purchases of crack cocaine from suspected distributors in the distribution ring. Law enforcement showed the cooperating individual pictures of people law enforcement suspected to be involved, and the cooperating individual moved to Junction City to infiltrate the distribution ring. The plan was for this cooperating individual to work his way up from the bottom of the chain to the top of the drug conspiracy. But the cooperating individual connected with Mr. Madkins—one of the higher level distributors in the conspiracy—soon after arriving in the Junction City area. So, law enforcement directed the cooperating individual call Mr. Madkins to see if he could purchase crack cocaine from him.

On June 1, 2012, the cooperating individual made his first purchase—buying $50 of crack cocaine from Mr. Madkins. When Mr. Madkins arrived for this sale, he was the passenger in a car driven by Mr. Banks. While $50 typically buys .5 grams, the crack cocaine the cooperating individual received amounted to less than .5 grams. Agent Virden testified that this was typical when purchasing a small quantity of drugs. Agent Virden also testified that once the cooperating individual established this connection with the upper-level organization members,

law enforcement no longer needed to focus on the lower-level participants.  So, the cooperating individual continued to arrange purchases from upper-level distributors after that point.

When the cooperating individual could not reach Mr. Madkins for the next purchase, he called Giovanni Davis, a friend of Mr. Madkins.  Mr. Davis put the cooperating individual in contact with Mr. Thompson because Mr. Davis had purchased the last of Mr. Madkins' crack cocaine earlier that day.  Mr. Thompson agreed to sell to the cooperating individual.  Again the cooperating individual paid $50, but received much less than .5 grams—.15 grams.  When Mr. Thompson got out the baggie of crack cocaine, the cooperating individual noticed that Mr. Thompson had about 15 different rocks of crack cocaine for distribution.

The cooperating individual continued to arrange purchases with Mr. Madkins, Mr. Thompson, and Mr. Banks through March 2013, increasing the quantity purchased over time to learn whether they could distribute larger quantities.  For example, on September 28, 2012, the cooperating individual asked Mr. Thompson for half of an ounce, or 14 grams, for $700.  Mr. Banks showed up for the sale, and sold the cooperating individual the crack cocaine.  When the lab weighed the substance it was 13.89 grams.  Agent Virden testified that the weight of purchases typically gets more accurate when larger purchases are made.  On October 3, the cooperating individual called Mr. Thompson for an ounce, or 28 grams, for $1,200.  Mr. Banks showed up for the sale and provided the cooperating individual 27.7 grams.

Because law enforcement learned through these controlled buys that Mr. Banks and Mr. Thompson could distribute ounce quantities to the cooperating individual, law enforcement began to focus on discovering their suppliers.  The cooperating individual asked Mr. Thompson how much he was selling, and indicated that he too wanted to start moving larger amounts of crack cocaine—the idea being that Mr. Thompson would not be able to supply the amount the

cooperating individual wanted to purchase and this might introduce him to Mr. Thompson's supplier. Mr. Thompson told the cooperating individual that he was selling nine ounces, or over 255 grams, a week.

The cooperating individual continued to increase the amounts he purchased. By November 2012, he had managed to purchase two ounce (about 56 grams) and three ounce (about 84 grams) quantities, for $2,200 and $3,400, respectively. At one of these purchases, Mr. Thompson informed the cooperating individual that he converted powder cocaine into the crack cocaine himself. So, law enforcement knew that the organization was cooking some of its own crack cocaine. Throughout January, February, and March 2013, the cooperating individual made a series of one ounce purchases from Mr. Thompson and Mr. Banks.

In total, the cooperating individual made 16 controlled buys amounting to 14 ounces, or more than 380 grams of crack cocaine from Mr. Madkins, Mr. Thompson, and Mr. Banks over the nine-month period. The cooperating individual never came across Ms. Johnson during the course of his involvement in the investigation, however.

### B. Wiretap Evidence

In March 2013, the investigation moved from a controlled purchase-based one to a wiretap phase. The KBI wiretapped certain people's phones and employed surveillance to view meetings arranged on the tapped calls. Law enforcement tapped seven phones—two for Mr. Banks, two for Mr. Thompson, one for Otis Ponds, and one for Mr. Ivory. At trial, the government introduced 30 phone calls involving Ms. Johnson. They spanned from March 22, 2013 to April 20, 2013. Twenty-eight of these phone calls were between Ms. Johnson and Mr. Thompson and two recorded Ms. Johnson's conversations with Mr. Banks. The court summarizes some of these calls and Agent Virden's trial testimony about them, below.

Agent Virden testified that Ms. Johnson discussed quantities of drugs during some of these calls, and the quantities she discussed exceed personal use amounts. For example, in a call on March 28, Mr. Thompson called Ms. Johnson and said that he would have a "teenager" ready for her. Agent Virden explained that a "teenager" is the equivalent of 1/16 of an ounce, or about 1.75 grams. Teenagers were discussed on other calls with Ms. Johnson as well. On one, Ms. Johnson told Mr. Thompson that she needed to get some more money, but he said that they would still do the "teenagers" at least. On another call, Mr. Thompson said he's going to give her "the straight drizzle" and the "teenager." During their calls, Ms. Johnson and Mr. Thompson commonly discussed whether she had a "buck" or a "dollar," which, Agent Virden testified, is $100 and would buy Ms. Johnson one gram.[1] He also testified that user quantities of crack cocaine are usually .5 grams or less and that during this investigation he saw people buy quantities as small as .2 grams.

Agent Virden also testified that Ms. Johnson and Mr. Thompson discussed seven grams on another call. On that call, Mr. Thompson called Ms. Johnson and encouraged her to tell her friend Patty to "send a couple hundred" his way. Mr. Thompson said that he was trying to get Ms. Johnson moving because he was going to be gone for a little bit. And Mr. Thompson told Ms. Johnson that if she was able to get something out of Patty, he would give Ms. Johnson some "real weight-weight." When Ms. Johnson agreed to tell Patty to call Mr. Thompson, he told Ms. Johnson that if she would "come with three" he will give her "a whole quarter." Agent Virden testified to his opinion that Mr. Thompson was trying to get rid of his drugs on this call because he was going to be gone, and so he was encouraging Ms. Johnson to get Patty to buy $200 worth. Agent Virden testified that Mr. Thompson asked Ms. Johnson to bring him a customer, and if she did, he would make it worth her time by selling her drugs at a discounted price. Agent Virden

---

[1] In Ms. Johnson's post arrest interview, she indicates $100 also might be enough to buy a teenager.

interpreted their conversation to mean if Ms. Johnson brought Mr. Thompson $300, he would give her a quarter of an ounce, or 7 grams.

On one of these 30 calls, Mr. Thompson told Ms. Johnson that he could get her started, even though she had no money with her.  Agent Virden testified that, on this call, Mr. Thompson agreed to front Ms. Johnson drugs, allowing her to pay him back his portion after she sold the drugs.  And Agent Virden also testified that, in his experience, dealers do not front people personal use quantities of crack cocaine that are not meant for resale.  This is so because, if the person was just going to use (and not going to sell) the fronted drugs, the dealer likely would not be able to recover his money later.  When Ms. Johnson said she was "hustling" and would need to talk to Mr. Thompson on another phone call, Agent Virden testified that he believed Ms. Johnson was out selling drugs, was running low on her supply, and needed to get more from Mr. Thompson to continue selling.

On a different call, Mr. Thompson told Ms. Johnson that he "would like to get some of [his] money like [Mr. Banks] be getting his."  Ms. Johnson agreed that she owed Mr. Thompson a buck and also told Mr. Thompson that she needed some help because "these bags are so damn short."  She told Mr. Thompson that she was working with "both of you all," and that she needed two bucks because "these people getting ready to sell two bucks" and she did not have anything left.  Mr. Thompson replied that he will be right over, but Ms. Johnson needed to make sure she had "one and a half."  Agent Virden testified that he thought Ms. Johnson was complaining to Mr. Thompson during this call that the bags of crack cocaine she received from Mr. Banks were light in weight.  And Agent Virden thought Ms. Johnson had some people who wanted $200 worth of crack cocaine, but Ms. Johnson did not have that much and she would need to get it from Mr. Thompson before she could sell to them.

6

Law enforcement recorded multiple calls between Ms. Johnson and Mr. Thompson on April 27. During one of these calls, Ms. Johnson said that she would pay Mr. Thompson his buck and a half and then would get something of her own. Agent Virden testified that, in his opinion, Ms. Johnson was waiting until she had at least $200 to give Mr. Thompson, then she would pay him $150 and get $50 worth of crack cocaine for herself. Agent Virden also testified that it is common for a dealer to provide a lower-level seller only small amounts at a time when that seller also is a user. He explained that a dealer might not want to give a low-level seller who also is user half of an ounce, because they might smoke too much of it before making enough to pay their dealer what they owe. So, instead, the dealer will provide a smaller quantity, like a teenager (1.75 grams) or an eight ball (1/8 of an ounce, or 3.5 grams), to sell, which produces a smaller loss for the original dealer if the user does take some for personal use.

On an April 29 call, Mr. Thompson asked Ms. Johnson if she wanted "a little bit of this drop" and Ms. Johnson said "yes." On April 30, Mr. Thompson told Ms. Johnson "I'm going to let you make some money off the drop too" and Ms. Johnson said "ok." Then, Mr. Thompson said "I'm going to give you the busy-it-is" but "you got to make $400 off of this" and Ms. Johnson said "I am . . . I'm going to make more." Agent Virden testified that Mr. Thompson asked Ms. Johnson on this call if she wanted some of the crack cocaine he had. And Agent Virden opined that Mr. Thompson had told Ms. Johnson she could have 1/8 of an ounce (3.5 grams), but, because it was better quality crack cocaine, she had to make more money selling it—at least $400. About three hours later, Ms. Johnson called Mr. Thompson and said "I'm going to get rid of the last of it."

During one call, Ms. Johnson asked Mr. Thompson if she should pick him up. On another one, she agreed to give Mr. Thompson a ride. Agent Virden testified that surveillance

often saw Mr. Banks or Mr. Thompson get rides from people when they went out on their rounds, distributing their crack cocaine. In a video of Ms. Johnson's interview after her arrest, discussed in more detail below, Ms. Johnson stated that she frequently gave rides to Mr. Banks and Mr. Thompson.

Finally, Agent Virden discussed the arrests made at the end of the investigation in May 2013. Law enforcement arrested 114 people total. They also obtained search warrants and searched a number of homes and cars, including Ms. Johnson's.

In sum, based on the references to buying and selling crack cocaine and the quantity of drugs discussed in the phone calls, Agent Virden testified that Ms. Johnson not only bought drugs from Mr. Banks and Mr. Thompson, but also redistributed the drugs she bought to other users. But, on cross examination, Mr. Virden admitted that law enforcement never seized any drugs from Ms. Johnson nor conducted surveillance of her to determine if she actually met with Mr. Thompson or Mr. Banks after the recorded calls to buy the drug quantities discussed.

### C. Cooperating Defendant Testimony

Charles Foster, a cooperating defendant, next testified for the government. He explained that he received crack cocaine from Mr. Thompson and Mr. Banks in exchange for doing work on their cars and apartments. Mr. Foster testified that he first met Ms. Johnson in 2005 or 2006. And he testified that he knew Ms. Johnson was involved with Mr. Thompson and Mr. Banks because he overheard them talking about receiving calls from her. Mr. Foster also testified that he was present for one of the phone calls Ms. Johnson placed to Mr. Thompson for crack cocaine. Mr. Foster explained that, without having to specify soft or hard, Mr. Thompson knew that Ms. Johnson wanted crack cocaine because of their history and because Mr. Foster never saw Ms. Johnson or anyone she hung out with use powder cocaine. And Mr. Foster testified that

he saw Ms. Johnson and Mr. Thompson meet at a location described in an intercepted call.  Mr. Foster testified that something was passed between them, but he could not see what it was.

On cross examination, Mr. Foster agreed that people in Junction City met at certain houses for "smokers' parties" during which they pooled their money and ordered a larger amount of crack cocaine to share.  Mr. Foster testified that it was not a profitable venture when they would do this.  Mr. Foster also never saw Ms. Johnson sell drugs, never bought drugs from Ms. Johnson, never saw her cook crack cocaine, and never saw her with large amounts of crack cocaine or money.  Mr. Foster said he viewed Ms. Johnson as a user not a dealer.

### D.  Post-Arrest Interview Video

After Mr. Foster testified, Joby Harrison, KBI Senior Special Agent, took the stand.  Mr. Harrison explained that he had conducted some of the post-arrest interviews of the individuals arrested during the investigation, and he was one of the agents who interviewed Ms. Johnson when she was arrested on May 8, 2013.  Detective Babcock, with the drug operations group in Junction City, also conducted part of Ms. Johnson's interview.  Through Mr. Harrison, the government introduced a video of Ms. Johnson's interview.

In that interview Ms. Johnson said that she knew Mr. Thompson and Mr. Banks.  Agent Harrison informed her that she was arrested as part of a conspiracy to distribute cocaine that involved Mr. Banks, Mr. Thompson, as well as everyone underneath them.  Agent Harrison read Ms. Johnson her *Miranda* rights, but Ms. Johnson waived those rights and chose to talk with him about the investigation.

Ms. Johnson admitted to using crack cocaine.  But she denied selling crack cocaine herself.  She also denied being around Mr. Thompson when he sold crack cocaine.  When asked if she knew Mr. Thompson sold crack cocaine, Ms. Johnson initially said that she had heard that

he did but she had never asked him for crack cocaine.  Ms. Johnson stated that she was not helping Mr. Thompson, but may have gotten a piece of crack cocaine from someone at a party, such as her friend Patty, who had purchased it from Mr. Thompson.  Ms. Johnson also denied ever running errands for Mr. Thompson or Mr. Banks to support her crack cocaine habit.  And she stated that she purchased her crack cocaine from someone neither Mr. Thompson nor Mr. Banks knows.

Ms. Johnson said that she had given rides to Mr. Thompson and Mr. Banks, but she explained that she did not know what they were doing on those rides.  At first, she stated that she was paid gas money in exchange for the rides, and took them to apartments and houses.  But she explained that she never asked why they needed a ride or who they were meeting.  Ms. Johnson said she sometimes gave Mr. Banks two or three rides a day.  And Ms. Johnson said she thought Mr. Banks might have purchased weed or K2 on those rides, but she had never seen him with anything.

Later, after Detective Babcock joined the interview, Ms. Johnson continued to deny that she ever sold crack cocaine.  When asked if she had sold crack cocaine in the past, she said that she may have sold "a piece" for a small fee to someone sitting next to her who also wanted to smoke.  She also stated that she was not going to houses to drop off drugs.

But, later in the interview, Ms. Johnson changed course.  She admitted that she gave rides to Mr. Thompson and Mr. Banks in exchange for gas money and crack cocaine.  Ms. Johnson explained that she gave them rides because Mr. Thompson and Mr. Banks did not have cars and it was an easy way to earn gas money and satisfy her addiction.  When Agent Harrison said "you know what the rides are for," Ms. Johnson nodded her head.  And Ms. Johnson agreed that in the dope game it is common to use other people's cars.

When asked how many rides she gave Mr. Thompson and Mr. Banks in the last three months, Ms. Johnson said that she did not drive Mr. Thompson often, but felt like she gave Mr. Banks a lot of rides, though not every day.  She said one time she gave Mr. Banks maybe four rides in one day, but explained that not all of those rides were to houses.  Ms. Johnson said that she also provided rides to the store and, other times, to houses to grab weed or K2 or something.

When asked how many rides she gave Mr. Thompson or Mr. Banks in a week "selling like that, driving em," she responded that she had done so two or three times a week.  And when asked who she drove around more, Ms. Johnson said "within that whole year you guys been having that that investigation, I might have did half with" Mr. Thompson and half with Mr. Banks.  She explained that she would drive whoever would give her the most crack cocaine at the time.  She also stated that she called them both an equal amount.

When asked how much crack cocaine she had seen Mr. Banks and Mr. Thompson possess, Ms. Johnson said that she usually did not see it.  Ms. Johnson explained that she only had seen what they gave her in exchange for rides, and that, at most, she would receive a "20 rock" (.2 grams) and at other times "dimes" (.1 grams).  When asked who they "deliver[ed] to" or "when you guys would take trips with them" where they would go, Ms. Johnson said they stayed in Junction City, usually going to houses like Patty's house, Mike's house, or Giovanni's house.  Ms. Johnson also stated that sometimes they did not go to a house, but, instead, just to a particular street.  Finally, Ms. Johnson said that she did not know where Mr. Thompson or Mr. Banks got their stuff from.

### E.  Evidence Discovered Through Searches

KBI Senior Special Agent Chris Turner testified about the searches conducted at the end of the KBI's investigation.  Agent Turner testified about the search conducted at the home owned

by Mr. Ivory—one of Mr. Banks and Mr. Thompson's suppliers.  Officers found about 5 ounces, or 132.28 grams, of crack cocaine, a pot used to cook powder cocaine into crack cocaine, a scale, and baggies.

During a search of Patty Foy's house, law enforcement found Ms. Johnson's phone. Officers generated a logical extraction report for the phone, which was admitted as evidence at trial.  Agent Turner testified that that Ms. Johnson had two numbers in her phone for Mr. Banks, two numbers for Mr. Thompson, and one number for another alleged supplier.  The logical extraction report also revealed that someone had deleted all call information on the phone on May 7, the day before Ms. Johnson was arrested.  Agent Turner testified that drug dealers periodically delete their call information so that it cannot be used against them later.  He also pointed out that some of the pictures on the phone dated back to April.  Still, the report revealed recent activity between Ms. Johnson and Mr. Thompson, as well as a missed call from Mr. Ponds—a person who served as a supplier to the conspiracy's leaders.

Agent Turner also testified about a piece of paper found during the search of Ms. Johnson's car that listed names with a number next to each name and a total sum calculated at the bottom.  At the top of this list was Mr. Thompson's commonly used nickname—"Ant."  It was written down twice on the list.  Agent Turner explained that, based on his experience, this was likely an "owe sheet"—a crude ledger used to keep track of who someone owes money to or who owes them money.  Investigators also searched Ms. Johnson's and Mr. Thompson's houses, but found nothing incriminating.

### F.  Jury Verdict at Trial

At the end of Ms. Johnson's four-day jury trial, the jury found Ms. Johnson guilty of conspiracy to distribute 280 grams or more of crack cocaine.  Doc. 1106 at 1.  The verdict form

was divided into two questions.  Question 1 asked whether the jury found Ms. Johnson guilty of

the conspiracy charged in Count One.  The form then directed the jury to turn to Question 2 if

they answered Question 1 "Guilty."  Question 2 asked the jury to determine the amount of crack

cocaine that the conduct of Ms. Johnson and "the reasonably foreseeable conduct of other

members of the conspiracy" had involved.  The jury found the conduct of Ms. Johnson and the

reasonably foreseeable conduct of the other members of the conspiracy involved 280 grams or

more of crack cocaine.  *Id.* at 2.

## II.  Motion for Judgment of Acquittal

### A.  Legal Standard

On a motion for judgment of acquittal under Fed. R. Crim. P. 29(c), "the court must

uphold the jury's verdict of guilty if 'any rational trier of fact could have found the essential

elements of the crime beyond a reasonable doubt.'" *United States v. Portillo-Quezada*, No. 03-

20051-JWL, 2004 WL 1822118, at *2 (D. Kan. Aug. 13, 2004) (quoting *United States v. Haber*,

251 F.3d 881, 887 (10th Cir. 2001)).  Said another way, the court will reverse a jury's verdict

only if no reasonable juror could have found the defendant guilty.  *United States v. Dewberry*,

790 F.3d 1022, 1028 (10th Cir. 2015) (internal quotation marks and citation omitted); *United

States v. Magleby*, 241 F.3d 1306, 1112 (10th Cir. 2001).

When reviewing a defendant's sufficiency of the evidence claim, the court "must ask

'only whether taking the evidence—both direct and circumstantial, together with the reasonable

inferences to be drawn therefrom—in the light most favorable to the government, a reasonable

jury could find [defendant] guilty beyond a reasonable doubt.'" *Magleby*, 241 F.3d at 1311–12

(quoting *United States v. Springfield*, 196 F.3d 1180, 1184 (10th Cir. 1999)).  "[T]he evidence

necessary to support a verdict need not conclusively exclude every other reasonable hypothesis

and need not negate all possibilities except guilt."  *Id.* at 1112 (internal quotation marks and

citation omitted).  And "where conflicting evidence exists" the court must "not question the jury's conclusions regarding the credibility of witnesses or the relative weight of evidence." *Id.* (citing *Springfield*, 196 F.3d at 1184).  Instead, the court simply must "'determine whether [the] evidence, if believed, would establish each element of the crime.'" *United States v. Vallo*, 238 F.3d 1242, 1247 (10th Cir. 2001) (quoting *United States v. Evans*, 42 F.3d 586, 589 (10th Cir. 1994)).  The court thus must give "considerable deference to the jury's verdict." *Dewberry*, 790 F.3d at 1028 (internal quotation marks and citation omitted).  But, while the court's review is deferential, the evidence must do "more than raise a mere suspicion of guilt." *Id.* (internal quotation marks and citation omitted).  And any inferences drawn "must be more than speculation and conjecture to be reasonable." *Id.*  (internal quotation marks and citation omitted).

### B.  Analysis

Ms. Johnson moves under Fed. R. Crim. P. 29(c) to "(1) set aside the jury's verdict of guilty and enter a judgment of acquittal, or (2) set aside the jury's special verdict with respect to the quantity of cocaine base attributable to her."  Doc. 1113 at 1.  She alleges insufficient evidence existed to support the jury's guilty verdict on the Count One conspiracy charge.  And she asserts insufficient evidence existed to support the quantity of cocaine the jury attributed to her.

### 1.  Guilty Verdict on Count One

Ms. Johnson first argues that insufficient evidence was presented to support the jury's verdict that she joined the large conspiracy charged in Count One, or that she acted with a specific intent to aid and abet that conspiracy.  *Id.* at 2.

"To obtain a conspiracy conviction, the government must prove that:  (1) there was an agreement to violate the law; (2) the defendants knew the essential objectives of the conspiracy;

(3) the defendants knowingly and voluntarily participated in the conspiracy; and (4) interdependence existed among the coconspirators." *United States v. Hanzlicek*, 187 F.3d 1228, 1232 (10th Cir. 1999).  The government may prove these elements "by direct or circumstantial evidence."  *Id.*

When the government charges a defendant as a member of one, broad conspiracy in an indictment, but that defendant alleges the evidence presented at trial proves only the existence of a separate, smaller conspiracy, a variance occurs.  *See United States v. Caldwell*, 589 F.3d 1323, 1328 (10th Cir. 2009); *see also Hanzlicek*, 187 F.3d at 1232 ("A variance arises when the evidence adduced at trial establishes facts different from those alleged in an indictment."). Because the government must prove a defendant was a member of the single conspiracy charged in an indictment, not merely that defendant was a member of some other conspiracy, the existence of such a variance may support acquittal.  *Id.*; *see also Hanzlicek*, 187 F.3d at 1232 ("Any such variance is reversible error only if it affects the substantial rights of the accused. Accordingly, where a single conspiracy is charged in the indictment, and the government proves only multiple conspiracies, a defendant who suffers substantial prejudice must have his conviction reversed."); *United States v. Griffin*, 493 F.3d 856, 862 (7th Cir. 2007) ("We treat a conspiracy variance claim as an attack on the sufficiency of the evidence supporting the jury's finding that each defendant was a member of the same conspiracy.").  "Distinguishing between a single, large conspiracy and several smaller conspiracies is often difficult; [courts] will generally defer to the jury's determination of the matter."  *Id.*  But, "[t]he evidence supporting the [conspiracy] conviction must be substantial and do more than raise a suspicion of guilt."  *Id.* at 1239.

Ms. Johnson argues that, viewing the evidence admitted at trial in the light most favorable to the government, a reasonable jury could conclude only that Ms. Johnson agreed to participate in a separate, smaller conspiracy—*i.e.*, purchasing crack cocaine from Mr. Thompson and Mr. Banks and distributing some of it to others.  Doc. 1113 at 3.  But, she contends, no reasonable jury could conclude that she joined the larger distribution conspiracy charged by Count One, because the only evidence to support her buying and distributing came from the wiretap evidence, which was short in duration (only 39 days) and involved only small quantities. *Id.* at 4.  Beyond the wiretap evidence, the substantial drug quantity evidence came from the controlled buys and Mr. Ivory's house, neither of which the government connected to Ms. Johnson.  So, she asserts, a reasonable jury only could infer that she was an addict who participated in a separate, smaller conspiracy—distributing small quantities to support her personal crack cocaine use—and thus was not interdependent with the conspiracy charged in Count One. *Id.* at 4–5.  She argues that one reasonably could infer from the evidence that she would buy from anyone and then distribute to support her own habit, but did not care about the success of the larger conspiracy.  She thus contends that she was not acting for the shared mutual benefit needed to be a part of the larger conspiracy charged. *Id.*

The government, on the other hand, asserts that sufficient evidence exists to support the jury's verdict that Ms. Johnson joined the larger conspiracy charged in Count One.  The court agrees.  A rational juror could have found the essential elements of the conspiracy beyond a reasonable doubt through the direct and circumstantial evidence presented at trial and reasonable inferences therefrom.

First, Ms. Johnson's motion concedes that a reasonable jury could infer that she participated in a conspiracy to distribute crack cocaine. *See* Doc. 1113 at 3–4.  The required

agreement to violate the law "need not be explicit, but rather may be inferred from the facts and circumstances of the case.  An agreement to distribute drugs can sometimes rationally be inferred from frequent contacts among the defendants and from their joint appearances at transactions and negotiations." *United States v. Evans*, 970 F.2d 663, 669 (10th Cir. 1992) (internal quotation marks and citations omitted).  But casual transactions "or a buyer-seller relationship between the defendant and a member of the conspiracy" are not enough.  *Id.*

A reasonable jury could find beyond a reasonable doubt that an agreement to violate the law existed here.  A reasonable jury could infer from the recorded phone calls and Agent Virden's testimony that an agreement to buy and distribute crack cocaine existed and it went beyond mere casual transactions or a buyer-seller relationship.  On those calls Ms. Johnson arranged small, personal-use purchases and distribution-quantity purchases of crack cocaine from Mr. Banks and Mr. Thompson.  She also arranged purchases between Mr. Thompson and other users.  The evidence about Ms. Johnson providing rides to Mr. Thompson and Mr. Banks, who she knew were distributors of crack cocaine, also supports a reasonable inference of an agreement to violate the law.  The government thus presented sufficient evidence at trial for a rational juror to find beyond a reasonable doubt that an agreement to violate the law existed.  *See United States v. Horn*, 946 F.2d 738, 742–43 (10th Cir. 1991) (concluding that evidence existed to support a finding that defendant was a member of the larger common plan to distribute where defendant's activities represented "more than evidence of isolated transactions not linked to the conspiracy," and, instead, involved bringing in customers, selling, and delivering cocaine).

Second, a reasonable jury could have found beyond a reasonable doubt that Ms. Johnson knew the essential objectives of the conspiracy.  "To prove knowledge of the essential objectives of a conspiracy, the government does not have to show the defendant knew all the details or all

the members of a conspiracy." *United States v. Yehling*, 456 F.3d 1236, 1240 (10th Cir. 2006). It "only needs to demonstrate 'the defendant shared a common purpose or design with his alleged coconspirators.'" *Id.* (quoting *United States v. Evans*, 970 F.2d 663, 669 (10th Cir. 1992)).

Here, a rational juror could find that Ms. Johnson shared a common purpose or design with her alleged coconspirators. The essential objective of the conspiracy was to distribute crack cocaine for profit. And the government presented sufficient evidence to enable a rational juror to find beyond a reasonable doubt that Ms. Johnson knew about that objective. The government's video evidence established that Ms. Johnson often provided rides to Mr. Banks and Mr. Thompson, the same individuals from whom she purchased crack cocaine, in exchange for crack cocaine and gas money. The post-*Miranda* interview video supports a reasonable inference that Ms. Johnson knew the purpose of these rides was to distribute crack cocaine. Additionally, on wiretapped phone calls, Ms. Johnson discussed buying crack cocaine for herself and, also, larger amounts to distribute to other users. She and Mr. Thompson discussed making money "off the drop" as well. The phone call evidence also allows a reasonable juror to infer that Ms. Johnson knew the essential objectives of the conspiracy and shared a common purpose or design with her alleged coconspirators. *See* Doc. 1113 at 4 (acknowledging in Ms. Johnson's motion that "[a] reasonable jury could infer that, in order to further her goal of obtaining personal use crack cocaine, she also distributed small quantities that she purchased from [Mr. Thompson] and [Mr. Banks]"). The government thus presented sufficient evidence at trial to support a finding beyond a reasonable doubt that Ms. Johnson knew the essential objectives of the conspiracy.

Based on this same evidence, a reasonable jury could find beyond a reasonable doubt that Ms. Johnson knowingly and voluntarily participated in the conspiracy. To participate on a

knowing and voluntary basis in a conspiracy, a defendant "need not know of the existence or identity of the other members of the conspiracy or the full extent of the conspiracy." *United States v. Metropolitan Enters., Inc.*, 728 F.2d 444, 451 (10th Cir. 1984).  But a defendant "must have a general awareness of both the scope and the objective of the enterprise to be regarded as a coconspirator." *Evans*, 970 F.2d at 670.  Again, her in post-arrest interview video played at trial, Ms. Johnson admitted that she gave rides to Mr. Thompson and Mr. Banks in exchange for crack cocaine and gas money.  A rational juror could infer that Ms. Johnson knew the purpose of these rides was to distribute crack cocaine, and that by agreeing to drive Mr. Thompson and Mr. Banks around, defendant knowingly and voluntarily involved herself in the larger conspiracy.  *See Horn*, 946 F.3d at 743 (explaining that by selling, agreeing to bring in customers, and making deliveries, "defendant became part of the larger common plan to distribute well in excess of fifty grams of cocaine").  The fact that Ms. Johnson was "paid in kind" for her driving services "is of no moment." *Id.*

The wiretap evidence and Agent Virden's testimony that Ms. Johnson also distributed crack cocaine for her own profit further supports a finding that Ms. Johnson knowingly and voluntarily participated in the conspiracy.  Even if Ms. Johnson participated so she could support her own habit, the government presented sufficient evidence to support a finding beyond a reasonable doubt that her participation was knowing and voluntary.  *See id.*  ("The same jury could choose to credit the testimony of other witnesses and determine that defendant knowingly and voluntarily became a part of the conspiracy, if only to supply his cocaine dependency. ")

Finally, though Ms. Johnson argues evidence to support the fourth element was lacking, a reasonable jury could find beyond a reasonable doubt that interdependence among the coconspirators existed.  When reviewing the jury's determination that Ms. Johnson joined the

single conspiracy charged in Count One, the court focuses on whether her conduct satisfied this

fourth element.  *See Caldwell*, 589 F.3d at 1329.  As the Tenth Circuit has explained:

> Interdependence exists where coconspirators "inten[d] to act together for their shared mutual benefit within the scope of the conspiracy charged."  *United States v. Evans*, 970 F.2d 663, 671 (10th Cir.1992).  Circumstantial evidence alone is often sufficient to demonstrate interdependence; indeed, it is often the only evidence available to the government.  *See United States v. Hutchinson*, 573 F.3d 1011, 1035 (10th Cir. 2009).  Further, a single act can be sufficient to demonstrate interdependence.  *See, e.g., United States v. Hamilton*, 587 F.3d 1199, 1208-09 (10th Cir. 2009) (determining that a single instance of traveling to collect another drug dealer's debts was sufficient to show defendant became a part of a large and wide-reaching conspiracy).

*Id.*

Though the government's wiretap evidence spanned just 39 days, a reasonable jury could

infer from Ms. Johnson's post-arrest interview that she had been involved with Mr. Thompson

and Mr. Banks throughout the entire period charged and was not merely involved in a separate,

smaller conspiracy.  When asked who she drove more, Ms. Johnson said "within that whole year

you guys been having that that investigation, I might have did half with" Mr. Thompson and half

with Mr. Banks.  A rational juror could infer from this video that Ms. Johnson knew Mr. Banks

and Mr. Thompson distributed drugs during those rides, and that she was helping them do so, in

exchange for a personal benefit.  The evidence presented at trial also connected Ms. Johnson

with one of the people believed to serve as a supplier, Mr. Ponds, through a missed call on her

phone.  And the evidence sufficiently established that Ms. Johnson acted together with her

alleged coconspirators for their shared mutual benefit.  Not only did Ms. Johnson benefit by

receiving crack cocaine in exchange for providing rides two or three times per week, a rational

juror also could deduce from the wiretap evidence that Ms. Johnson and Mr. Thompson mutually

benefited by working together in other ways.  For example, a reasonable jury could have inferred

that Ms. Johnson referred her friend Patty Foy to Mr. Thompson after their phone call, allowing

him to make a $200 sale before leaving town.  And, in exchange, Ms. Johnson acquired "a whole

quarter," or seven grams—a distribution size quantity from which she could profit—from Mr.

Thompson at a discounted price.  On another call, Mr. Thompson promised to let Ms. Johnson

"make some money off the drop too" and Ms. Johnson assured him she will make more than

$400.  In sum, the government presented sufficient evidence at trial for a rational jury to find

interdependence.  *See United States v. Wardell*, 591 F.3d 1279, 1291 (10th Cir. 2009)

("Interdependence is present if the activities of a defendant charged with a conspiracy facilitated

the endeavors of other alleged coconspirators or facilitated the venture as a whole." (internal

quotation marks and citation omitted)).

   Through the direct and circumstantial evidence presented at trial and reasonable

inferences made from that evidence, viewed in the light most favorable to the government, a

reasonable jury could find, beyond a reasonable doubt, that Ms. Johnson joined the Count One

conspiracy.

   Ms. Johnson also argues that no evidence was presented to support a guilty verdict that

Ms. Johnson aided and abetted the Count One conspiracy.  *Id.* at 5.  But, for the same reasons the

court concludes sufficient evidence existed to find that Ms. Johnson joined the Count One

conspiracy, the court also concludes sufficient evidence existed to support a finding that Ms.

Jonson aided and abetted the Count One conspiracy.

   Under 18 U.S.C. § 2, "[w]hoever commits an offense against the United States or aids,

abets, counsels, commands, induces or procures its commission, is punishable as a principal."

"To be guilty of aiding and abetting, 'the defendant must willfully associate [her]self with the

criminal venture and seek to make the venture succeed through some action of [her] own.'"

*Vallo*, 238 F.3d at 1248 (quoting *United States v. Whitney*, 229 F.3d 1296, 1303 (10th Cir.

2000)).  Ms. Johnson argues that her post-arrest interview does not show the specific intent necessary to find she aided and abetted the larger conspiracy because she only admitted to providing rides in exchange for gas and crack cocaine.  She asserts that she did not know the purpose of the rides, associate herself with the criminal venture, or intend to help Mr. Thompson and Mr. Banks further the conspiracy.  Surely, a rational jury might have come to the factual conclusion that this argument advocates.  But a rational juror, drawing reasonable inferences, also could have reached the opposite conclusion, finding that Ms. Johnson willfully associated herself with the criminal venture and attempted to advance its success by providing the rides to Mr. Thompson and Mr. Banks.

In her post-arrest interview, Ms. Johnson admitted she provided frequent rides— sometimes three or four rides a day—taking Mr. Thompson and Mr. Banks not only to the store, but also to houses and sometimes just to a street.  The houses they visited were houses occupied by crack cocaine users known to Ms. Johnson.  And Ms. Johnson herself received crack cocaine from her passengers.  This evidence supports a reasonable inference that Ms. Johnson knew the purpose of the rides she provided was to distribute crack cocaine and that, by providing the rides, she associated herself willfully with the criminal venture and sought to help it succeed.  The court cannot question the jury's conclusions about the credibility of Ms. Johnson's statements during her interview.  *Magleby*, 241 F.3d at 1312 (citing *Springfield*, 196 F.3d at 1184).

The court denies Ms. Johnson's motion to set aside the jury's verdict of guilty on Count One.

### 2.   Special Verdict on Quantity

Ms. Johnson next argues that the evidence was insufficient to support the jury's finding that 280 grams or more of crack cocaine was involved.  The government introduced evidence of far more than 280 grams of crack cocaine through the controlled buys using the cooperating

individual and through the crack cocaine found at Mr. Ivory's house.  Ms. Johnson asserts that there was "zero evidence of her involvement during the time where the confidential informant was buying crack cocaine" or connecting her to Mr. Ivory.  Doc. 1113 at 7.  So, she contends, the only amount of crack attributable (or reasonably foreseeable) to her was less than 28 grams—*i.e.*, the smaller quantities discussed on the wiretapped phone calls, which did not begin until March 2013.  Ms. Johnson argues that any conclusion that she joined the conspiracy before the wiretap evidence "would require pure speculation not supported by any evidence."  Doc. 1113 at 8.

The court disagrees.  A jury could draw a reasonable inference from Ms. Johnson's post-arrest interview that she drove Mr. Thompson and Mr. Banks two to three times a week throughout the entire investigation, not just beginning in March 2013.  This conclusion is not pure speculation.  And even if Ms. Johnson had joined the ongoing conspiracy as late as her argument posits, she still is accountable for her co-conspirators' earlier conduct.  *United States v. Hamilton*, 587 F.3d 1199, 1207 (10th Cir. 2009) ("a defendant who joins an ongoing conspiracy may be held accountable—for purposes of determining the scope of liability for the conspiracy charge itself—with the acts or statements of coconspirators that occurred prior to his entry into the conspiracy, if those acts or statements were in furtherance of the conspiracy.")

Also, Ms. Johnson argues that, even if the evidence supports the conclusion that she joined the conspiracy before March 2013, no evidence exists to support the conclusion that the sales to the cooperating individual or the crack cocaine found at Mr. Ivory's house were reasonably foreseeable to Ms. Johnson.  This is so, she contends, because the evidence shows only that she engaged in discussions about small quantities of crack cocaine with Mr. Banks and Mr. Thompson—at most 7 grams (1/4 ounce) and typically only 1.75 grams (1/16 ounce) or less, but nothing shows that she knew Mr. Banks or Mr. Thompson sold ounce quantities and greater.

23

Yet, it was reasonably foreseeable that Mr. Banks and Mr. Thompson were selling to other buyers besides Ms. Johnson, such as the cooperating individual, and sometimes in larger quantities.  Indeed, Ms. Johnson's post-arrest interview shows her admitting that she provided frequent rides—sometimes more than once a day—to Mr. Banks and Mr. Thompson over the course of the investigation.  The wiretap evidence captured Ms. Johnson agreeing to connect Mr. Banks and Mr. Thompson with other buyers.  For example, Ms. Johnson agreed to direct Patty Foy to buy $200 worth of crack cocaine from Mr. Thompson.  Based on the frequency of Ms. Johnson's acts providing transportation to the conspiracy's leaders while they made their sales rounds, the content of the wiretapped calls, and Ms. Johnson's videotaped admission that she acted as a connector between crack cocaine buyers and the conspiracy, a rational juror could conclude that Ms. Johnson's reasonably foreseeable conduct exceeded the quantities she discussed during her phone calls with Mr. Banks and Mr. Thompson.

Also, a reasonable jury could conclude that it was reasonably foreseeable that Mr. Banks and Mr. Thompson had suppliers for their product.  While Ms. Johnson asserted in her post-arrest interview that she did not know who supplied Mr. Banks and Mr. Thompson, the jury, not the court, must assess the credibility of this statement.  Other evidence presented to the jury showed Ms. Johnson in contact with a different supplier—Mr. Ponds.  In sum, the jury's verdict concluded that the quantity of crack cocaine admitted at trial—in excess of 280 grams—was reasonably foreseeable to Ms. Johnson.  While the jury might have interpreted the evidence to come to a different conclusion, a rational trier of fact could have reached the same conclusion that the jury reached here.  This means the court must uphold the jury's verdict on this essential element of Ms. Johnson's conviction.  *Haber*, 251 F.3d at 887.

Finally, Ms. Johnson argues that the quantity of crack cocaine found by the jury not only must be reasonably foreseeable to her, but also be within the scope of the criminal activity that she agreed to undertake. As support, Ms. Johnson quotes a passage from *United States v. Biglow*[2] for the proposition that the jury could attribute drug quantities to her only if they were "'within the scope of the agreement *and* reasonably foreseeable'" to her. *See* Doc. 1113 at 9 (quoting *Biglow*, 635 F. App'x at 401). While this is a correct statement of the law governing drug quantity determinations that sentencing judges must make under the Sentencing Guidelines at sentencing hearings, it does not apply to the elemental determination that the jury must make. *See Alleyne v. United States*, 133 S. Ct. 2151, 2158 (2013). The court agrees with the government: Ms. Johnson's argument improperly "conflates the elements of the offense of conviction . . . and the requirements" imposed on sentencing judges under the Sentencing Guidelines. Doc. 1122 at 2-3.

Ms. Johnson's argument also misunderstands *Biglow*. It was a sentencing case, and the Circuit's holding there turned on a sentencing error. Specifically, it turned on the principle that "quantity of drugs attributable to a defendant *at sentencing* is not necessarily the same as the amount involved in the conspiracy as a whole." *Biglow*, 635 F. App'x at 399 (citation and internal quotation marks omitted). For evident reasons, the instructions did not ask the jury to make any finding about the quantity of crack cocaine properly attributable to Ms. Johnson under the Sentencing Guidelines. The rules assign this determination to the sentencing judge at the sentencing hearing. *United States v. Figueroa-Labrada*, 720 F.3d 1258, 1262, 1265 (10th Cir. 2013) (explaining that, while a jury may find a defendant joined a large conspiracy involving a significant amount of drugs, the court must make particularized findings at sentencing about "the scope of the specific agreement the individual defendant joined in relation to the conspiracy as a

---

[2] 635 F. App'x 398, 400 (10th Cir. 2015).

whole," and that the amount of drugs attributable to a defendant at sentencing includes "all quantities of contraband with which he was directly involved and . . . all reasonably foreseeable quantities of contraband that were within the scope of the criminal activity that he jointly undertook" (internal quotations and citations omitted)); *Biglow*, 635 F. App'x at 400 ("[A] drug-conspiracy conviction alone is insufficient to make an individual conspirator responsible for the entire quantity of drugs for which the conspiracy was responsible.  Instead, these defendants may only be punished for the amount of controlled substances that can be 'attributed' to them personally as opposed to the conspiracy generally."); *Biglow*, 554 F. App'x at 683 overruled on other grounds by *Musacchio v. United States*, 136 S. Ct. 709 (2016) ("Generally, 'a defendant who joins an ongoing conspiracy may be held accountable—for purposes of determining the scope of the liability for the conspiracy charge itself—[for] the acts or statements of coconspirators that occurred prior to his entry into the conspiracy, if those acts or statements were in furtherance of the conspiracy.' . . . Although . . . [defendant] cannot be held accountable at sentencing for any amounts not attributable to him, a reasonable jury could have found that [defendant] joined an ongoing conspiracy involving more than 500 grams of cocaine.").

In sum, the court rejects Ms. Johnson's argument that the quantity of crack cocaine found on the special verdict form must be set aside and the court thus denies Ms. Johnson's Motion for Judgment of Acquittal.

### III.   Motion for New Trial

#### A.  Legal Standard

On a motion for a new trial under Fed. R. Crim. P. 33, the court may grant a new trial "if the interest of justice so requires."  Fed. R. Crim. P. 33(a); *see Portillo-Quezada*, 2004 WL

1822118, at *3.  Such motions "'should be granted only with great caution.'"  *Id.* (quoting *United States v. Custodio*, 141 F.3d 965, 966 (10th Cir. 1998)).

### B.  Analysis

Ms. Johnson moves the court to vacate her conviction and grant a new trial because, she contends, the jury's special verdict on Question 2 of the verdict form misstated the law. Question 2 required the jury to determine the quantity of crack cocaine involving Ms. Johnson's conduct and the reasonably foreseeable conduct of other members of the conspiracy.  Ms. Johnson contends that an additional requirement—that the quantity be within the scope of the criminal activity that she agreed to undertake—was omitted.

Ms. Johnson's Motion for New Trial, like her Motion for Judgment of Acquittal, confuses the standard applied by the court at sentencing, and the standard applied by the jury in making its drug quantity finding.  For the same reasons set out in Part II.B.2 above, the court denies Ms. Johnson's motion.

### IV.    Conclusion

For the reasons explained above, the court denies Ms. Johnson's Motion for Judgment of Acquittal (Doc. 1113) and Motion for New Trial (Doc. 1114).  The government presented evidence sufficient for a rational juror to find Ms. Johnson guilty beyond a reasonable doubt. And, Ms. Johnson has failed to show that the ends of justice require a new trial.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant Karen Antoinette Johnson's Motion for Judgment of Acquittal (Doc. 1113) and Motion for New Trial (Doc. 1114) are denied.

**IT IS SO ORDERED.**

Dated this 19th day of August, 2016, at Topeka, Kansas.

s/ Daniel D. Crabtree
Daniel D. Crabtree
United States District Judge